**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR420-124-17 |
| | ) | |
| JOSEPH PARRISH, | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

Defendant Joseph Parrish has moved to suppress intercepted communications obtained by law enforcement via Title III wiretaps, *see* doc. 683, and evidence obtained by law enforcement from the search of his house and truck, *see* doc. 684. The Government opposes each, *see* docs. 728 & 734, and Parrish has replied in support of each, *see* docs. 759 & 760. The Court held an evidentiary hearing on November 1, 2021. Doc. 852 (Minute Entry). The motions are now ripe for review.

## I.    BACKGROUND

From November 2019 through July 2020, law enforcement agents sought, and this Court issued, a series of eleven orders authorizing the interception of telephone communications as part of an investigation into an alleged drug-trafficking conspiracy. Doc. 932 at 1 (Order denying co-

1

defendant's suppression motion).  At issue here are two of those orders authorizing interception of target telephone eight ("TT8") and target telephone nine ("TT9").  Doc. 683 at 1.

On April 23, 2020, the Government applied for a wiretap authorization order for TT8, alleged to be used by Parrish's co-defendant Jontae Keel.  Doc. 683 at 2; *see also* doc. 539-28.  The Court issued an Order authorizing the intercepts that same day, doc. 539-29, and interception of TT8 began on April 24, 2020.  *See* 852-2 at 108.  The Government filed an application to renew the wiretap of TT8 along with a supporting affidavit on May 22, 2020, *see* doc. 539-32, which was granted, doc. 539-33.  Interception of TT8 continued until June 20, 2020.  Doc. 852-2 at 111.  After the Court granted an extension of time in which the Government could present the recordings for sealing – a topic discussed in more detail below – the recordings from TT8 were sealed on June 26, 2020.  *Id*. at 106-107, 113-114.

The Government applied for a wiretap authorization for TT9 on June 5, 2020.  Doc. 683 at 6.  The Court granted the request, and a subsequent extension request, resulting in intercepts of TT9 from June 5, 2020 through July 23, 2020.  *Id*.; *see also* doc. 921 at 99.  The recordings

from TT9 were sealed on July 29, 2020.  Doc. 921 at 103; *see also* doc. 852-2 at 125-26.

On July 20, 2020, as part of the continued investigation into the alleged drug-trafficking organization, a law enforcement agent applied for a search warrant for six individuals and seven properties.  *See* doc. 684 at 1-2, doc. 852-2 at 1-9.  Relevant to the issues before this Court, a Chatham County, Georgia Superior Court Judge issued a search warrant for Parrish and his residence at 155 Junco Way, Savannah, Georgia, doc. 852-2 at 43-47 (the "Junco Way Warrant"), and for "[t]he geographical location and curtilage" of 506 Barberry Drive, Savannah, Georgia, *id.* at 35-40 (the "Barberry Drive Warrant").  The Junco Way Warrant identified two vehicles to be searched and seized at that location: a white 2016 Chevrolet Camaro and a white 2019 Chevrolet Silverado.  *Id.* at 45. The Barberry Drive Warrant identified four vehicles to be searched and seized: a black 2017 Chevrolet Camaro, a black 2018 Nissan Altima, a white 2016 Nissan Maxima, and the same white 2016 Chevrolet Camaro also identified in the Junco Way Warrant.  *Id.* at 38.  It did not list the Chevrolet Silverado from the Junco Way Warrant.  *Id.*

The search warrants were simultaneously executed on July 22, 2020. *See* doc. 921 at 54-55; *see also* doc. 852-2 at 41-42 (Barberry Drive Warrant Return), 48-49 (Junco Way Warrant Return). Douglas Dye, a special agent with the Federal Bureau of Investigation, was the team leader for the search of 506 Barberry Drive. *Id.* at 54. During the search of that residence, law enforcement agents located and searched the white 2019 Chevrolet Silverado. *Id.* at 56; *see also* doc. 852-2 at 41-42. The Silverado was found in the rear yard of the home, parked along a wooden fence. Doc. 921 at 58; *see also* doc. 852-2 at 50-52 (photos).

As a result of the Government's investigation, on November 5, 2020, a grand jury indicted 29 defendants in a 27-count indictment. Doc. 3. Parrish is charged with one count of conspiracy to possess with intent to distribute and to distribute cocaine, cocaine base, and marijuana in violation of 21 U.S.C. § 846, two counts of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and two counts of maintaining drug-involved premises in violation of 18 U.S.C. § 856(a)(1). *See id.*

Parrish challenges the validity of the TT8 and TT9 wiretaps on two, independent grounds.[1]  First, he argues that the wiretaps were based on applications that failed to demonstrate necessity, a requirement imposed by 18 U.S.C. § 2518(1)(c).  *See* doc. 683 at 7-14.  Second, he argues that the Government failed to timely seal the recordings of the interceptions as mandated by 18 U.S.C. § 2518(8)(a).  *See* doc. 683 at 14-16.  He argues that all evidence relating to him obtained through interception of wire, oral, or electronic communications involving TT8 and TT9 should be suppressed.  *Id.* at 16.

Parrish also separately moves to suppress the searches of 155 Junco Way and the 2019 Chevrolet Silverado.  Doc. 684.  He argues that (1) the search warrant application and supporting affidavit failed to establish probable cause that his residence would contain evidence of a crime, (2) the Superior Court Judge who issued the warrant relied upon stale information, (3) the search warrant application and the warrants were overbroad and permitted a general search, (4) the affidavit for the Junco

---

[1] Parrish challenges the wiretaps as an "aggrieved person" under 18 U.S.C. § 2518(10)(a).  *See* doc. 683 at 8.  An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication . . . ."  18 U.S.C. § 2510(11).  The Government does not contest Parrish's position as an "aggrieved person."  Doc. 728 at 2.  Accordingly, Parrish has standing to challenge the wiretaps at issue.

Way Warrant did not seek authorization to search to Chevrolet Silverado, and (5) the search warrants were the unlawful fruit of the Title III intercepts challenged in his motion to suppress the wiretaps.  Doc. 684 at 2.

## II.   DISCUSSION

### A.   Title III Wiretaps

#### 1. Necessity

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 . . . prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses."  *United States v. Giordano*, 416 U.S. 505, 507 (1974).  Among the various requirements the Government must meet before a wiretap may be authorized is the "necessity" requirement.  The Government satisfies this requirement by including in its application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  This requirement "is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will

succeed." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." *United States v. Collins*, 300 F. App'x 663, 666 n. 2 (11th Cir. 2008).

"Section 2518 does not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted; however, it does require the Government to show why alternative measures are inadequate for this particular investigation." *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (internal quotes and cites omitted); *see also Van Horn*, 789 F.2d at 1496 ("The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves."). Moreover, "'the partial success of alternative investigative measures' does not foreclose the use of a wiretap." *United States v. Goldstein*, 989 F.3d 1178, 1195 (11th Cir. 2021) (quoting *Perez*, 661 F.3d at 581-582). In the context of a conspiracy investigation, where more traditional investigative techniques have uncovered useful historical

information, a wiretap may still be needed to identify all of the co-conspirators and to reveal the full scope of the conspiracy. *Id.*

The judge considering a wiretap application "is clothed with broad discretion in its consideration of the application." *U.S. v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (citation omitted). An order authorizing a wiretap "will not be overturned simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *Id.* at 869. The defendant has the burden of overcoming the presumption of validity that attaches to a district judge's findings that the necessity provisions have been satisfied. *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001); *see also United States v. Aguirre-Benitez*, 2017 WL 9477737, at *11 (N.D. Ga. Apr. 24, 2017) ("A wiretap order is presumed to be valid, and a defendant has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained." (internal quotes, alteration, and citation omitted)).

Parrish challenges the orders authorizing the wiretaps of TT8 and TT9 as not supported by the requisite necessity. Doc. 683 at 7. His argument, however, focuses on the affidavit submitted in support of the application for TT8. *See id.* at 2-5, 8-12 (describing the affidavit in

support of the request for wiretap for TT8); *see also id.* at 12 ("[T]he TT8 Application and TT8 Order failed to satisfy the necessity requirement, in violation of Title III.").  He then argues that "[u]se of any and all evidence obtained as a result of the TT8 Order, and any subsequent orders or extensions authorizing or approving the interception of wire, oral, or electronic communications, must be excluded from this case." *Id.* at 13. Because Parrish focuses on the application and affidavit for TT8, so too will the Court.

The application for TT8 details fourteen methods of investigation and explains why those methods were used and failed or would be unlikely to succeed or too dangerous to employ: confidential human sources/sources of information, doc. 539-28 at 41-47; physical surveillance, *id.* at 47-52; controlled purchases, *id.* at 52-55; undercover agents, *id.* at 55-59; consensually recorded conversations, *id.* at 59-60; search warrants, *id.* at 60-61; interviews, grand jury subpoenas, and immunity, *id.* at 62-63; trash searches, *id.* at 63-64; other surveillance techniques, *id.* at 64-65; pen registers, trap and trace devices, and toll analysis, *id.* at 65-67; GPS and geo-location data, *id.* at 67; mail cover requests, *id.* at 68; vehicle tracker, *id.* at 68-69; and financial

investigation, *id.* at 69-70.   Upon the Government's application, the District Judge found that it had been "adequately established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ."  Doc. 539-29 at 5.

Parrish argues that the affidavit in support of the request for a wiretap of TT8 is insufficient as to necessity, since it acknowledges that the law enforcement agents had already arrested co-defendant Joseph Bulloch, alleged to be the head of the drug-trafficking organization ("DTO").  Doc. 683 at 9.  The affidavit also acknowledged that agents had executed a search warrant for Bulloch's residence and stash house which led to the seizure of large quantities of drugs, currency, and firearms.  *Id.* This, argues Parrish, shows that the use of search warrants "had clearly proven successful."  *Id.*  He further contends that the affidavit "reveals how other investigative procedures used by the agents had proven successful . . . ."  *Id.*

In arguing that the TT8 affidavit contains information sufficient to satisfy the necessity requirement, the Government highlights the goals and objectives of the investigation:

a. To discover the full scope and identification of key personnel involved in illegal drug trafficking on behalf of BULLOCH, the TARGET SUBJECTS, and other members of the BULLOCH DTO yet unknown;

b. To discover the identities and roles of all suppliers of illegal drugs or controlled substances to the identified conspirators;

c. To discovery the main customers and co-conspirators of KEEL, other TARGET SUBEJCTS, and others yet unknown;

d. To discover the stash locations where illegal drugs are stored prior to distribution, in order to seize the largest quantities possible to disrupt the DTO's distribution efforts;

e. To discover the management and disposition of proceeds generated by the organization's narcotics trafficking, in order to seize proceeds and assets derived from, and utilized to, fund and facilitate the criminal activity of the DTO; and

f. To obtain admissible evidence which demonstrates beyond a reasonable doubt that KEEL and the other TARGET SUBJECTS and any later identified targets, committed the alleged violations of law set forth herein.

Doc. 728 at 21-22.

In analyzing wiretap applications in investigations of criminal conspiracies, courts have found such lofty goals reasonable when determining whether a wiretap application demonstrates the requisite necessity. *See United States v. Allen*, 274 F. App'x 811, 816 (11th Cir.

11

2008) (where traditional methods produce evidence of street-level transactions, which is unhelpful to the government's goal of revealing the entire conspiracy, the district court is not required to force the government to redefine its objectives; "the government's ultimate objective and the traditional methods' usefulness to that objective are important to the necessity inquiry."); *United States v. Degaule*, 797 F. Supp. 2d 1332, 1360 n. 22 (N.D. Ga. 2011) ("[A]lthough the government had uncovered a portion of the drug and money laundering conspiracy, that fact did not require the investigation to end before the entire conspiracy and all co-conspirators were discovered."). " '[The Eleventh Circuit] has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members.' " *United States v. Kelley*, 2009 WL 2589086, at *2 (S.D. Ala. Aug. 17, 2009) (quoting *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1365-66).

This Court has already reviewed the application for TT8 and determined that the detailed information provided by investigators about techniques that had either been used to limited success, or were deemed

either futile or too dangerous to use in the ongoing investigation, was

sufficient.   Doc. 823 at 15 *adopted by* doc. 932.   In making that

determination, the Court extensively reviewed the affidavit and each of

the alternative investigative methods discussed by the law enforcement

agent, specifically as they related to Keel, the alleged user of TT8:

> At the time the Government applied for TT8, investigators
> had developed five confidential human sources ("CHS").  Doc.
> 753 at 41.  Of the five, two did not have access to Keel, and
> investigators believed that they were too far removed from the
> targeted criminal activity.  *Id.* at 41-42.  The affidavit in
> support of the wiretap application describes the challenges
> faced by confidential human sources in drug trafficking cases
> generally, *see* doc. 753 at 42-44, but also specifies challenges
> faced by CHSs in this investigation, *see id.* at 44-45.  Because
> of these challenges, investigators did not have informants who
> could make detailed inquiries concerning other purchasers,
> sources of supply, shipments of drugs, stash locations, and/or
> methods of operations used by members of the alleged drug-
> trafficking organization, including Keel.  *Id.* at 44.
>
> The TT8 application also details the difficulties surrounding
> physical surveillance of suspected DTO members, including
> Keel.  Doc. 753 at 46-50.  Investigators attempted surveillance
> at Keel's apartment, but the apartment complex layout made
> it difficult to maintain physical surveillance of the apartment.
> *Id.* at 49.  Moreover, investigators believed that Keel had been
> tipped off about the investigation by a co-defendant who had
> already been arrested, making surveillance even more
> difficult, and particularly susceptible to discovery.  *Id.* at 49-
> 50.  This is in addition to alleged DTO members conducting
> criminal activity inside numerous residences and vehicles
> where investigators are unable to view the transactions, as

well as in close-knit neighborhoods where investigators believe firearms are present. *Id.* at 50-51.

The TT8 application also discusses controlled purchases of narcotics. Doc. 753 at 51-54. Although investigators attempted nine controlled purchases from alleged DTO members, some were unsuccessful, and some resulted in targets believed to be higher in the organization pushing the prospective purchaser off onto subordinates. *Id.* at 51. While there were two controlled buys that were deemed a success, investigators did not believe that additional controlled buys would uncover enough information about the inner workings of the alleged DTO. *Id.* at 52. As to Keel, investigators did not believe their source would be able to conduct controlled purchases from him. *Id.* at 53.

The TT8 application also describes an attempt to use an undercover agent in the investigation. Doc. 753 at 54-58. The attempt detailed does not involve Keel. *Id.* Because of the ultimate failure of the undercover agent's attempts, and because of the members' wariness of new individuals, investigators determined that introducing undercover agents would be difficult and dangerous. *Id.*

The TT8 application further explains that some of the confidential sources were able to consensually record conversations with some members of the alleged DTO. Doc. 753 at 58. These sources did not have access to Keel. *Id.* The application also admitted that investigators had identified what they believed to be stash houses, including one maintained by Keel, and had probable cause for search warrants. *Id.* at 60. Even though investigators believed they had sufficient probable cause, they also believed that the requested wire taps would aid them in developing more probable cause. *Id.*

The TT8 application also explained why interviews, grand jury subpoenas, and offers of immunity would not be successful techniques, since the targets would likely invoke

their Fifth Amendment privileges or lie under oath.  Doc. 753 at 61-62.  Trash searches were likewise considered futile, particularly as to Keel, since he lives in an apartment complex with a communal dumpster.  *Id.* at 63.  Video surveillance was also considered unhelpful.  *Id.* at 64.

The investigators did detail their ability to obtain pen register trap and trace orders on several numbers, including one belonging to Keel.  Doc. 753 at 64-65.  However, this information only provided investigators with the list of numbers called by a particular number, along with the incoming call numbers, but not any contents.  *Id.* at 65.  Similarly, while they obtained GPS location data for Keel, it was not specific enough to provide investigators with sufficient information about Keel's location and activities.  *Id.* at 66.  Finally, the application details why mail cover requests had not returned information, and why investigators had not placed a GPS device on Keel's car.  *Id.* at 66-67.

Doc. 823 at 12-15, *adopted* doc. 932.

The Court's reasoning in its prior Order holds true here. Considering the detailed information provided by investigators about techniques that had either been used to limited success, or were deemed either futile or too dangerous to use in the ongoing investigation, and considering the presumption of validity that accompanies a wiretap order, Parrish has not met his burden in demonstrating that the application failed to show necessity.  His motion to suppress the wiretaps on that ground should be **DENIED.**

## 2. Sealing

Parrish next challenges the timeliness of the sealing of the recordings from TT8 and TT9.  Doc. 683 at 14-16.  Section 2518(8)(a) requires that "[t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device" and that recording "shall be done in such way as will protect the recording from editing or other alterations."  18 U.SC. § 2518(8)(a).  The section further provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."  *Id.*  The sealing requirement was imposed by Congress to "ensure the reliability and integrity of evidence obtained by means of electronic surveillance."  *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990).

Recordings are sealed "immediately" if done within one or two days of the expiration of the order authorizing the intercepts.  *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005).  Intervening weekends do not count in the calculation of whether recordings were immediately sealed.  *See United States v. Wong*, 40 F.3d 1347, 1375 (2d Cir. 1994) ("We

16

have recognized that weekends and holidays present legitimate obstacles to the sealing of tapes."); *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994) ("Intervening weekends . . . are satisfactory explanations for slight delays in presenting wiretap recordings for sealing."); *United States v. Carson*, 969 F.2d 1480, 1498 (3rd Cir. 1992) (intervening weekends not counted when determining whether tapes were sealed "as soon as was practical."); *United States v. Riley*, 2019 WL 2093248, at *9 (S.D. Ga. Apr. 19, 2019) ("Weekends need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration."); *United States v. Bryant*, 2014 WL 317694, at * 7 (S.D. Ga. Jan. 28, 2014) ("It is well settled that weekends need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration.").

Where the Government does not seal the recordings "immediately," it must provide a "satisfactory explanation," which requires it to explain why a delay occurred and why it is excusable. *Ojeda Rios*, 495 U.S. at 265. The Eleventh Circuit has not provided a standard to use in evaluating whether the Government's proffered reason for a delay is satisfactory under § 2518(8)(a). *See United States v. Mayfield*, 2017 WL

9477736, at *25 (N.D. Ga. Feb. 28, 2017).  Therefore, following the lead of the Northern District of Georgia, when faced with a prior challenge to the Government's untimely sealing in this case, this Court looked to guidance from other circuits for its analysis.  Doc. 823 at 19 *adopted by* doc. 932 at 6 (citing *Mayfield*, 2017 WL 9477736 at *25).  Like the court in *Mayfield*, this Court, when confronted with a co-defendant's sealing challenge, applied a set of factors condensed down from the analyses of the Second, Fourth, and Seventh Circuits to evaluate the Government's explanation: "the stated reason for the delay, the plausibility or believability of the reason, and whether the record shows that it is the actual reason for the delay; whether the reason is objectively reasonable; the length of the delay; and whether there is any evidence that the government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings i.e., whether the government acted in bad faith."  Doc. 823 at 20 (internal citation and quotation omitted).

Parrish challenges the sealing of the recordings from the wiretap of TT8, since the interception terminated on June 20, 2020, but the recordings were not sealed until June 26, 2020.  Doc. 683 at 14.  To begin,

Saturday, June 20, 2020 and Sunday, June 21, 2020, as weekend days, should not be counted.  Even excluding these two days, the Government concedes that the TT8 recordings were not timely sealed.  Doc. 728 at 13-14.  That means the Government must explain the four-day delay from Monday, June 22, 2020, through Friday, June 26, 2020, when the Court sealed the recordings.

To make its showing, the Government presented the testimony of Agent Savannah Solomon, the administrative agent for the wiretaps in this case.  Doc. 852-2 at 58; doc. 921 at 95.  This Court has already considered Agent Solomon's testimony and concluded that the Government presented "a satisfactory explanation for the delay in sealing the recordings from TT8."  Doc. 932 at 6.  The Court summarized her testimony as follows:

> Solomon testified that, following a termination of monitoring, she submits a request in writing to the FBI's Atlanta office to download the sessions that are recorded during the monitoring period, and an automated process submits a similar request to its office in Quantico to download the data from those sessions.  ([Doc. 836] at 11.)  Monitoring of TT8 ended on June 20, 2020, a Saturday.  (*Id.* at 27.)  Solomon requested the disc from Atlanta on the next business day, June 22, 2020.  (*Id.* at 28.)  Because of the ongoing COVID pandemic, at that time the Atlanta FBI office was staffed at a critically low volume.  (*Id.*)  Solomon was familiar with the staffing levels in the Atlanta office because two of her "bosses"

are based in Atlanta, and "all of [the FBI's office in] Savannah's marching orders and information come directly from Atlanta." (*Id.* at 20-21.) The staffing levels in Atlanta led to a delay in the creation of the discs containing the downloaded intercepts for TT8. (*Id.* at 28.) Solomon testified that she "asked the supervisor of the electronic surveillance unit in Atlanta to escalate the request." (*Id.*) She further explained that, because of the pandemic and the resulting staffing shortages, she was on the phone with the supervisor and "working through the various chains of command to ensure that someone could come into the office." (*Id.* at 41-42.) As a result, someone was able to go into the office to fulfill her request. (*Id.* at 28-29.) Solomon presented the discs for sealing the day she received them. (*Id.* at 31.)

Doc. 932 at 4. The Court should again find that this explanation is satisfactory and **DENY** Parrish's motion as to TT8.

Parrish also challenges the timeliness of the sealing of TT9, since interceptions ended on July 23, 2020, but the recordings were not sealed until July 29, 2020. Doc. 683 at 14-15. Solomon testified that she requested the discs of the TT9 recordings on July 23, 2020, the same day that the interception was terminated. Doc. 921 at 103. July 25, 2020 and July 26, 2020 were weekend days. *Id.* Solomon expected to have the discs by July 27, 2020, which would have been within two business days of termination. *Id.* at 103-104. Delays caused by COVID-19, including FedEx shipping delays, meant the discs were not actually received that day. *Id.* at 104. Solomon enlisted the help of a colleague to coordinate

with teams in Atlanta and Quantico to find out the status of the discs, and when the team in Savannah could expect to receive the then-delayed discs. *Id.* at 105. She learned that the discs were delayed until at least July 29, 2020, and upon reporting that information to the United States Attorney's office, a motion to extend the deadline for sealing was filed. *Id.* That motion was granted, and the Government was ordered to provide the sealed discs within one business day of their receipt. *Id.* at 106. Solomon received the discs on July 29, 2020, and they were sealed that same day. *Id.* at 106-107.

Based on Solomon's testimony, the Court is persuaded that the delay in sealing the recordings from TT9 was caused by similar circumstances as the delay in sealing the recordings from TT8—limited staffing levels at the FBI's Atlanta office during the COVID-19 pandemic. There is no evidence that the Government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings, and there is no evidence of any tampering or manipulation of the recordings. The record shows that the Government kept the Court apprised of the status of the recordings, seeking extensions when it learned that the discs could not be timely sealed. There is nothing in the

record to indicate any bad faith on the part of the Government.  The explanation provided for the delay in sealing the recordings from TT9 is satisfactory, s*ee* 18 U.S.C. § 2518(8)(a), and Parrish's motion to suppress the wiretap should be **DENIED.**

### B.    Search Warrant

Parrish challenges the search of his residence at 155 Junco Way and of his 2019 Chevrolet Silverado and offers five arguments in support. Doc. 684 at 2.  Related to the search of 155 Junco Way, he argues, first, that the affidavit in support of the search warrant failed to establish probable cause that contraband or evidence of a crime would be found at the residence.  *Id.* at 8.  He also argues that the judge considering the warrant application relied upon stale information, *id.* at 11, and that the search warrant was overbroad, *id.* at 17.  As to the Chevrolet Silverado, he argues that its search violated the Fourth Amendment since it was located at 506 Barberry Drive but was not identified among the property to be searched at that location.  *Id.* at 13.  Finally, he challenges both searches as fruits of the unlawful intercepts challenged in his Motion to Suppress Wiretap Evidence.  *Id.* at 19-20.  The Government opposes each argument and, alternatively, argues that agents acted in good faith

reliance on the judge-issued warrants such that exclusion of evidence collected pursuant to those warrants would be inappropriate.  Doc. 734 at 13-14.

### 1. Junco Way Warrant

Agent Chris Petrou presented the search warrant application and affidavit, which included the request to search 155 Junco Way, to the issuing judge on July 20, 2020.  Doc. 852-2 at 34.  In the affidavit, he related that he learned from "CS-1," who the parties have stipulated is actually "a series of Title III intercepts," doc. 921 at 53, that a large shipment of marijuana was to be delivered to Parrish's house on June 13, 2020.  Doc. 852-2 at 28.  Based on surveillance and investigation up to that point, investigators believed Parrish's house to be 155 Junco Way. *See id.* at 20-21, 22, 28.  Agents observed a black Tahoe pulling a trailer arrive at 155 Junco Way on the date and around the time the intercepts indicated the drugs would be arriving.  *Id.* at 28.  After agents observed the truck and trailer arrive at 155 Junco Way, Title III intercepts revealed that co-defendant Keel alerted his California supplier that the mule transporting the marijuana had arrived.  *Id.*  Agents followed the truck and trailer after it left 155 Junco Way, conducted a traffic stop, and

found marijuana in the trailer. *Id.* at 28-29. Agents then intercepted a call which the affiant understood to be Keel instructing Parrish's brother to go get the marijuana from Parrish's house because of the traffic stop. *Id.* at 29.

The affidavit indicated that, based on the agent's understanding of the Title III intercepts, this was the third large shipment of marijuana delivered to Keel within about a month. *See* doc. 852-2 at 21 (100-pound shipment of marijuana to arrive on May 15, 2020), 24 (100-pound shipment of marijuana to arrive on June 1, 2020). Parrish was believed to be the recipient of at least a portion of the prior marijuana shipments. *Id.* at 25.

On July 13, 2020, a week before the warrant application was made, agents intercepted communications about another incoming shipment of marijuana. Doc. 852-2 at 29. GPS pings showed that the courier, Keel, and Parrish were all in the same location around the same time on the date of the expected shipment. *Id.* at 30. Agents observed two men loading a large rolling suitcase into the back of a truck believed to be Parrish's Chevrolet Silverado. *Id.* Based on GPS pings, Parrish eventually returned to the area of 155 Junco Way after first traveling to

24

the area of two known stash houses.  *Id*. at 31.

The affidavit also conveyed conversations between Keel, Parrish, and others, spanning May through June 2020, discussing what the agent believed to be narcotics.  For example, Keel's mother told him that Parrish had delivered a suitcase to her house at Barberry Drive, which the agent understood to contain either drugs or monetary proceeds.  Doc. 852-2 at 23.  Keel and Parrish discussed Keel storing his vehicle, which the agent believed to contain illicit drug proceeds, at Parrish's house.  *Id*. at 24.  And Keel told Parrish to go and hide his narcotics at his brother's house, which Parrish did not want to do.  *Id*. at 31.

Parrish, in two distinct but related arguments, contends that the affidavit did not provide sufficient probable cause for the warrant, and that it contained "stale" information.  Doc. 684 at 7-12.  The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  The Supreme Court has recognized that

a search warrant may issue where the affidavit supporting the warrant application establishes "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir.1999).  A court must consider the totality of the evidence in determining whether probable cause exists to justify the issuance of a search warrant, and that determination turns on the "assessment of probabilities in particular factual contexts. . . ."  *Gates*, 462 U.S. at 232. It is the task of a reviewing court to determine whether the issuing judge had a "substantial basis" for finding probable cause.  *Id.* at 238–39.  The Supreme Court has also instructed that "the preference for warrants is most appropriately effectuated by according 'great deference' to a[n issuing] magistrate's determination."  *United States v. Leon*, 468 U.S. 897, 914 (1984).

As to search warrants for residences, "[t]here need not be an allegation that the illegal activity occurred at the location," *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009), but the supporting affidavit "should establish a connection between the defendant and the residence to be searched and a link between the residence and any

26

criminal activity." *United States v. Mitchell*, 503 F. App'x 751, 754 (11th Cir. 2013) (citing *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002)). "[T]he affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'" *Kapordelis*, 569 F.3d at 1310 (quoting *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999)). The burden of establishing a link between the defendant's residence and alleged criminal activity is low because, as the *Kapordelis* court explained, "few places are more convenient than one's residence for use in planning and hiding fruits of a crime." *Id.* (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981)); *see also United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (holding evidence of defendant possessing contraband of type normally expected to be hidden in residence will support search).

The affidavit at issue supports the finding of probable cause to search Parrish's home at 155 Junco Way. It linked Parrish and 155 Junco Way, as that address was associated with him in databases, doc. 852-2 at 21, and cars registered to him were observed in the driveway, *id.* at 21, 22. *See also id.* at 28 (the investigation has identified Parrish's address

as 155 Junco Way).  The affidavit further supplied the issuing judge with a reasonable basis for concluding that Parrish "might keep evidence of his crimes at his home." *Kapordelis*, 569 F.3d at 1310.

According to the affidavit, investigators intercepted communications about a drug delivery at Parrish's home, and surveillance of the house corroborated those interceptions.  Doc. 852-2 at 28-29.  The affidavit further described two different conversations that indicated to the agent that Parrish had narcotics at his house.  *Id.* at 29 (Keel instructing Parrish's brother to go retrieve marijuana from Parrish's house), 31 (Keel instructing Parrish to move his drugs to someone else's house, which Parrish refused to do).  The affidavit also described a suspected drug delivery, where a bag believed to contain narcotics was loaded into Parrish's truck, and, after two other stops, Parrish ultimately returned to the area of 155 Junco Way.  *Id.* at 30-31. The opinions and conclusions of the affiant about what he—based on his experience as a law enforcement agent—believed, were appropriate for the issuing judge to consider when making the probable cause determination.  *United States v. Robinson*, 62 F.3d 1325, 1331 at n.9 (11th Cir. 1995) (citing *United States v. Motz*, 936 F.2d 1021, 1024 (9th

Cir. 1991)).  The "totality of the circumstances" presented in the affidavit indicated that there was a fair probability of discovering contraband at Parrish's house.  *See Anton*, 546 F.3d at 1358.  The Junco Way Warrant was supported by probable cause, and Parrish's motion to suppress on those grounds should be **DENIED.**

Parrish argues that the information in the affidavit was stale and therefore cannot support probable cause.  Doc. 684 at 11.  "A warrant application based upon stale information of previous misconduct is insufficient, because it fails to create probable cause that similar or other improper conduct is continuing to occur."  *United States v. Bascaro*, 742 F.2d 1335, 1345-46 (11th Cir.1984), abrogated on other grounds by *United States v. Lewis*, 492 F.3d 1219 (11th Cir.2007).  In determining whether information is stale, courts must consider the nature of the suspected crime, and "distinguish between criminal activity that is 'protracted and continuous' and criminal activity that is 'isolated.'  *United States v. Schimmel*, 317 F. App'x 906, 909 (11th Cir. 2009) (citing *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000)).  "Protracted and continuous activity is inherent in large-scale drug trafficking operations."  *Bascaro*, 742 F.2d at 1346.  This ongoing conduct renders the passage of

time less significant.  *Schimmel*, 317 F. App'x at 909 (quoting *Bervaldi*, 226 F.3d at 1265).

The affidavit described ongoing drug activity in which Parrish was a participant.  *See* 852-2 at 23, 25, 27, 28-29, 30-31.  It detailed repeated deliveries of large quantities of marijuana to the Savannah area and connected Parrish to at least three of those deliveries.  *Id.* at 25 (intercepted communications informed agent that Parrish was to receive 40 pounds out of the 100-pound shipment); 28 (truck and trailer believed to be marijuana delivery observed at Parrish's house); 30 (based on GPS location data and surveillance, Parrish believed to be involved in suspected marijuana delivery).  Because the facts in the affidavit suggest an ongoing drug operation, including a delivery of marijuana nine days prior to the warrant application, *see* doc. 852-2 at 29, the information in the affidavit was not stale.  *See Schimmel*, 317 F. App'x at 909.  Parrish's motion to suppress the search of 155 Junco Way on staleness grounds should be **DENIED.**

Parrish also challenges the search warrant as overbroad.  Doc. 684 at 17.  He claims that the warrant authorized the search and seizure of "a broad range of financial documents, phones, computers, and hard

drives that permitted the search to become a prohibited general search." *Id.* The warrant, he contends, runs afoul of the Fourth Amendment's particularity requirement, which prevents "general, exploratory rummaging in a person's belongings." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (cites omitted). He argues that this overbreadth renders the Junco Way Warrant defective, and the search pursuant to that warrant unlawful. Doc. 684 at 19.

A warrant that fails to sufficiently particularize the place or things to be seized is unconstitutionally overbroad and the resulting general search is unconstitutional. *United States v. Travers*, 233 F.3d 1327, 1329-30 (11th Cir. 2000); *United States v. Mitchell*, 503 F. App'x 751, 754 (11th Cir. 2013). A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized. *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011). The Eleventh Circuit instructs that the particularity requirement "be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Wuagneux*, 683 F.2d at 1349 (citations omitted).

31

The Junco Way Warrant authorized the agents to seize seventeen enumerated items:

1. Cocaine, marijuana

2. Packaging material in preparation for sale or distribution to include scales, baggies, heat sealers.

3. Verizon telephone utilizing cellular numbers 912-755-5784, 912-239-0023, 912-675-9303 and 912-665-3189, AT&T telephone utilizing cellular numbers 404-268-6794, 912-250-9720, 912-257-3041, 912-508-7019, 912-358-8242, 912-631-7138 and 912-412-6993 and receipts, bills, packaging, and any related documentation for same. This includes any receipts associated with the purchase of the same, as well as any billing and/or account information, receipts for pre-paid or daily plans, "pin" receipts, "top up" of minute receipts, or any other evidence of usage options and purchase of such. Further, Affiant is requesting to inspect and download the contents of each phone, to include and [sic] call logs, SMS text messages, MMS messages, emails, websites visited and communicated through, internet links sent and received, pictures, and contacts.

4. Other cellular telephones as well [as] receipts, bills, or packaging and any related documentation for same. This includes nay receipts associated with the purchase of the same, as well as any billing and/or account information, receipts for pre-paid or daily plans, "pin" receipts, "top up" of minute receipts, or any other evidence of usage options and purchase of such. Further, Affiant is requesting to inspect and download the contents of each phone, to include and [sic] call logs, SMS text messages, MMS messages, emails, websites visited and communicated through, internet links sent and received, pictures, and contacts.

5. SIM cards containing phone numbers, contact information, and other stored data, as well as any other electronic storage devices, including but not limited to hard drives, thumb drives, jump drives, computers, PDA's, electronic "notebooks", tablets, iPADs, and/or similar devices.

6. Ledgers containing names or other identifies of persons purchasing and/or selling cocaine or other controlled substances, and/or containing amounts owed, gained, loss [sic] or unaccounted for, dates of transactions, and related transactional and financial information.

7. Packaging material for controlled substances and cocaine in preparation for sale or distribution include [sic]: scales, baggies, and heat sealers, presses and stamps.

8. Documents evidencing occupancy at the above listed residence, including but not limited to any bills, account statements, utility documentation, subscriptions, rental agreements, leases, mortgage information, and other documentation related to financial or occupancy ties to the residence. Also, any of this same documentary evidence relating to any other residences associated with KEEL, WASHINGTON, and/or PARRISH.

9. 2016 Chevrolet Camaro (white in color) . . . .

10. 2019 Chevrolet Silverado (white in color) . . .

10. US currency [numbering in original].

11. Jewelry and other valuables believed to have been purchased with illicit funds[.]

12. Documents related to the renting, leasing, or purchase or ownership of motor vehicles, including but not limited to rental agreements with auto rental companies.

13. Documents related to the renting, leasing, or purchase or ownership of houses, land, and other property.

14.    All firearms, ammunition, and firearm components.

15.    Documents related to travel, to include but not limited to gas receipts, hotel receipts, parking receipts, maps, and GPS devices, passports.

16.    Credit cards, debit cards, checks, receipts, tax documents and bank statements.

Doc. 852-2 at 44-45.    While Parrish challenges the warrant as "overbroad," he does not specifically identify which of these enumerated items he contests.   Instead, he refers somewhat generically to "financial documents, phones, computers, and hard drives."   Doc. 684 at 17-18.

The items enumerated in the Junco Way Warrant are similar to those challenged in *United States v. Smith*, where the Eleventh Circuit found that a warrant describing the property to be seized as "cocaine, documents, letters, photographs, business records, and other evidence relating to narcotics trafficking" was not overbroad.  918 F.2d 1501, 1507 (11th Cir. 1990).  In making its determination, the Court reasoned that "this language is directed to materials having a nexus to narcotics trafficking" and that it "meets the standards of practical accuracy that enable the searcher to ascertain and identify things authorized to be seized."  *Id.* at 1507-08.  Similarly, here, the warrant to search 155 Junco Way particularly described the items to be seized, and those items

reasonably fell within the scope of probable cause set forth in the affidavit to search the house for evidence of drug possession and distribution criminal conduct.   Moreover, Parrish has not directed the Court's attention to any particular item of evidence that he contends was improperly seized during the search of 155 Junco Way as a result of the alleged overbreadth.   Parrish's motion to suppress on overbreadth grounds should be **DENIED**.

### 2. Chevrolet Silverado

Parrish's Chevrolet Silverado, which was identified as an item to be searched and seized in the Junco Way Warrant, was not found at that location.   Instead, it was parked at 506 Barberry Drive at the time the Barberry Drive Warrant was executed.   *See* doc. 852-2 at 42 (Barberry Drive Warrant Return).   The Barberry Drive Warrant authorized the search of Jontae Keel, Jo Ann Keel Robinson, Parrish, and the "geographical location and curtilage" of 506 Barberry Drive.   *Id*. at 35-37. It listed nineteen categories of items to be searched and seized, including four specific vehicles.   *Id*. at 37-39.   The Chevrolet Silverado was not identified as a vehicle to be searched.   *Id.*

Parrish argues that the search of his truck should be suppressed, since "the searching agents executing the 506 Barberry Drive Search Warrant could not rely on the warrant to search the Chevy Silverado, which was not described among the vehicles to be searched in the warrant."   Doc. 684 at 16.   He also argues that the Barberry Drive Warrant did not support the search of Parrish's truck, even though it was found on the premises, since agents were aware that the truck did not belong to the owner of that house.   *Id.*

The Government initially argued that, because the truck was located on the "property" or the "premises" of 506 Barberry Drive during the execution of a valid warrant, the search of the truck was supported by that same warrant.   Doc. 734 at 8-9; *see also id*. at 11 ("The search of Defendant's vehicle at 506 Barberry Drive was authorized by the [Barberry Drive] search warrant, supported by probable cause, and appropriate both under the Fourth Amendment and long standing Eleventh Circuit precedent.").   During the hearing, this argument developed into an argument that the truck was properly searched as a vehicle located within the curtilage of 506 Barberry Drive, and therefore covered by the Barberry Drive Warrant.   Doc. 921 at 76; *see also id*. at 77

("[Law enforcement] had probable cause that [the owner of 506 Barberry Drive] was storing narcotics and illegal proceeds on [sic] vehicles located on the curtilage, and so any vehicle on the curtilage would have been authorized at that point."). In response, Parrish's counsel sought permission from the Court to file a post-hearing brief on the specific curtilage issue, doc. 921 at 83-84, which the Court permitted, doc. 852. Defendant and the Government have each filed their permitted brief. *See* docs. 894, 919.

As the Eleventh Circuit, this Court, and other district courts within the circuit have recognized, the search of a vehicle on the premises during the execution of a search warrant is authorized. *See, e.g., Brooks v. United States*, 416 F.2d 1044 (5th Cir. 1969) ("Search of the automobile was completely justified under the terms of the search warrant, for which there was probable cause, in that the warrant authorized the search of both the lot and the cabin, and the automobile at the time the search warrant was executed was parked in the lot and very close to the cabin."); *United States v. Napoli*, 530 F2d 1198, 1200 (5th Cir. 1976) ("We think that the reference to 'on the premises known as 3027 Napoleon Avenue' was sufficient to embrace the vehicle parked in the driveway on those

premises.");[2] *United States v. Armstrong*, 546 F. App'x 936, 939 (11th Cir. 2013) ("[B]y authorizing agents to search [the defendant's] "property," the search warrant permitted them to search the Cadillac, which, it is undisputed, was located on the property described in the search warrant."); *Lanigan v. United States*, 2019 WL 8013031, at *4 (S.D. Ga. November 25, 2019) *adopted by* 2020 WL 865418 (S.D. Ga. February 19, 2020) ("[T]he warrant permitted officers to search vehicles found within the curtilage of the property. . . ."); *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1343-44 (N.D. Ga. 2011) ("[C]ircuit precedent authorizes the search of a vehicle on the premises during the execution of a search warrant[.]"); *United States v. Ridolf*, 76 F. Supp. 2d 1305, 1311 (M.D. Ala. 1999) ("There is binding precedent in this circuit holding that a search of the premises includes vehicles parked on the premises.").

In their post-hearing briefs, the parties argued whether the truck was found within the curtilage of 506 Barberry Drive. *See generally* docs. 894, 919. The arguments center on the four factors identified by the Supreme Court in *United States v. Dunn* for use in determining the

---

[2] The decisions in both *Brooks* and *Napoli* are binding Eleventh Circuit authority. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981).

extent of a home's curtilage.  *See* doc. 894 at 2-3 (citing *Dunn*, 480 U.S. 294, 301 (1987)); *see also* doc. 919 at 3 ("Whether the protection of the curtilage applies relies on the four factors outlined in Defendant's brief."). Those factors are: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by.  *Dunn*, 480 U.S. at 301.  Parrish's focus on these factors, and his argument that the truck was not located within the curtilage of 506 Barberry Drive, seems to indicate his concession that, if the truck is determined to be within the curtilage it was properly searched pursuant to the Barberry Drive Warrant.  As the individual challenging the search, Parrish bears the burden of demonstrating that the truck was outside the scope of the warrant.  *See United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977) ("It is well established that the burdens of proof and persuasion generally rest upon the movant in a suppression hearing.").[3]

---

[3] In his post-hearing brief, Parrish states, correctly, that "[o]n a motion to suppress evidence obtained through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  Doc. 894 at 2. However, here, the Government contends that the Silverado was searched pursuant

Using the four factors from *Dunn* as a guide, the Court should find that Parrish's Chevrolet Silverado was located within the curtilage of 506 Barberry Drive when agents searched it, and that the search was, therefore, authorized by the Barberry Drive Warrant. The search team assigned to 506 Barberry Drive found the Chevrolet Silverado in the "rear yard of the residence." Doc. 883 at 8. It was located along a wooden fence, parked parallel with the house, along with other vehicles. *Id.* at 10. The vehicles were "stacked" along the fence, and the Silverado was the second car in the line of vehicles. *Id.* at 11-12; *see also* doc. 852-2 at 50-51 (photos). The first vehicle in the line, an SUV, was "very close to the house." Doc. 883 at 12. The truck was parked "approximately 10 feet from the . . . SUV." *Id.* Although Agent Dye indicated that the truck was found in a "fenced yard," *id.*, and the photographs clearly show that at least a portion of the yard is fenced, *see* doc. 852-2 at 50, when pressed, Dye could not recall whether there was a fence along the rear of the yard that completely enclosed the area. *Id.* at 15-16. The truck was not

---

to the Barberry Drive Warrant. Therefore, Parrish bears the burden. *See, e.g.*, *United States v. Rives*, 2015 WL 7574759, at *6 (N.D. Ga. September 15, 2015) ("[W]ith respect to attacks on searches conducted pursuant to a warrant, "[t]he warrant stands cloaked with a presumption of validity . . . and [a defendant] ha[s] the burden of proof in challenging the validity of its execution or service." (citing *United States v. Vigo*, 413 F.2d 691, 693 (5th Cir. 1969)).

parked inside of any garage or other freestanding building or covered area. *Id.* at 16.

The first *Dunn* factor asks the Court to consider the "proximity of the area claimed to be curtilage to the home." 480 U.S. at 301. The photographs and the agent's testimony demonstrate that the truck was parked about ten feet from the car parked directly beside the home. While there is no fixed distance provided by either the Supreme Court or the Eleventh Circuit to determine "close proximity," *see United States v. Garrott*, 745 F. Supp. 2d 1206, 1210 (M.D. Ala. 2010), the truck here was parked close enough to the home that this factor leans in favor of finding that the truck is within the curtilage. *Dunn* next instructs the Court to consider whether the area is "included within an enclosure surrounding the home." 480 U.S. at 301. Although the agent's testimony was inconclusive as to whether the *entire* back yard is fenced in, the photographs clearly show that the truck was parked inside of a fence that continued to extend towards the rear of the yard. *See* doc. 852-2 at 50-52. The yard was, therefore, at least partially enclosed at the location where the truck was parked. This factor, too, supports a finding that the truck was within the curtilage. The third *Dunn* factor looks to the

"nature of the uses to which the area is put." 480 U.S. at 301. The record shows that the area was used to park vehicles, which is not necessarily the "intimate activities of the home" contemplated by the Court in *Dunn*. *Id.* at 302. This factor tips in favor of Parrish. However, the fourth *Dunn* factor, whether the area has been protected from observation by people passing by, again weighs in favor of a finding that the truck was within the curtilage. *See Dunn*, 480 U.S. at 303. The high fence directly in front of the truck indicates an intent by the homeowner to protect the backyard from casual observation by people on the neighboring property. *See* doc. 852-2 at 50-52. In all, the factors weigh in favor of a determination that the truck, parked in what Parrish even concedes is the "backyard of Mrs. Keel," *see* doc. 894 at 4, was within the curtilage of her property and thus covered by the search warrant. Parrish's motion to suppress the search of the Silverado should, therefore, be **DENIED.**

The Government asserts two alternative arguments to support the search of the Silverado. It contends that, should the Court disagree that the truck was properly searched pursuant to the Barberry Drive Warrant, that the search was justified under either the automobile exception or by the plain view exception, and supported by probable

cause.  Doc. 919 at 5.  Since the Court finds that the truck was properly searched pursuant to the Barberry Drive Warrant, it need not reach these alternative arguments.

### 3. Title III Wiretaps

Parrish finally challenges both searches as improper since the affidavit in support of the search warrants relied on the intercepts challenged in his Motion to Suppress Title III Wiretaps.  *See* doc. 684 at 19-20.  Because Parrish's motion to suppress the wiretap of TT8 and TT9 should be denied, so too should his motion to suppress the searches based on those intercepts.

### 4. *Leon* Good Faith Exception

The Government contends that the evidence discovered is admissible, despite any infirmity in the warrant, pursuant to the "good faith" exception to the exclusionary rule.  Doc. 734 at 13-14.  The Supreme Court, in *United States v. Leon*, held that officers' objectively reasonable reliance on a warrant, even one which was subsequently determined to lack probable cause, removed any practical justification for applying the exclusionary rule.  *See* 468 U.S. at 921 (excluding evidence because the executing officer reasonably relied on the issuing magistrate's probable

cause determination "cannot logically contribute to the deterrence of Fourth Amendment violations."). Given that exception, "searches conducted pursuant to warrants will rarely require suppression." *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990).

As to 155 Junco Way, the Court's earlier finding that the affidavit provided, at least, a "substantial basis" for a finding of probable cause belies any contention that it so lacked indicia of probable cause that a reasonable officer could not have relied upon it. As *Leon* recognized, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination . . . ." 468 U.S. at 921. This case is not extraordinary. The determination that there was a "substantial basis" for the original probable cause finding, is, therefore, equally adequate to establish that the executing officer had a good faith belief in the warrant's validity. If the issuing magistrate acted reasonably, then so did the officers. Accordingly, the good-faith exception precludes suppression of evidence obtained from 155 Junco Way, and therefore provides an alternative basis to deny Parrish's motion as to that search.

## III.   CONCLUSION

Defendant Joseph Parrish's Motion to Suppress Title III Wiretap Evidence should be **DENIED**, doc. 683, and his Motion to Suppress Search of 155 Junco Way and a 2019 Chevrolet Silverado should be **DENIED**, doc. 684.

This Report and Recommendation (R&R) is submitted to the district court judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.   The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*,

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED** this 18th day of January, 2022.

_____

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA